UNITED STATES, Appellee,

v.

Jose Salvador ANDUJAR,
Defendant–Appellant.

UNITED STATES, Appellee,

v.

Amador IRIZARRY–SANABRIA,
Defendant–Appellant.

UNITED STATES, Appellee,

v.

Pedro INFANTE, Defendant–Appellant.

Nos. 92–2376 to 92–2378.

United States Court of Appeals,
First Circuit.

Heard Nov. 7, 1994.

Decided March 6, 1995.

Ramón García, by Appointment of the Court, for appellant José Salvador Andújar.

Gabriel Hernández–Rivera, by Appointment of the Court, on brief, for appellant Amador Irizarry–Sanabria.

Thomas R. Lincoln, by Appointment of the Court, with whom Law Offices of Thomas R. Lincoln was on brief, for appellant Pedro Infante.

José A. Quiles–Espinosa, Sr. Litigation Counsel, with whom Guillermo Gil, U.S. Atty., was on brief, for appellee.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and BOYLE,* Senior District Judge.

TORRUELLA, Chief Judge.

On July 17, 1992, defendants Amador Irizarry–Sanabria, José Salvador Andújar, and Pedro Infante–Ruiz were convicted by a jury in federal district court for conspiracy to import approximately 3000 pounds of marijuana and for the possession of a firearm in relation to the commission of said narcotics offense, in violation of 21 U.S.C. §§ 952(a) and 963, and 18 U.S.C. § 924(c)(1), respectively. All defendants now appeal. José Salvador Andújar alleges that the evidence was insufficient to support the jury's verdict. Amador Irizarry–Sanabria (1) challenges the sufficiency of the evidence; (2) alleges that the district court erroneously instructed the jury regarding the meaning of reasonable doubt; and (3) maintains that the district court abused its discretion in precluding the defense from presenting certain impeachment testimony. Pedro Infante–Ruiz alleges (1) that the district court misapplied the United States Sentencing Guidelines (the "Guidelines") in determining his sentence; and (2) that the jury instructions impermissibly reduced the government's burden of proof at trial. For the following reasons, we *vacate* the conspiracy and § 924(c)(1) convictions of José Salvador Andújar. All other convictions are *affirmed.*

## I. BACKGROUND

We recite the facts in the light most favorable to the government. *United States v. Echeverri,* 982 F.2d 675, 676 (1st Cir.1993). The charges contained in the indictment arose from an unsuccessful operation to import narcotics into Puerto Rico from Colombia. The pertinent facts occurred between September 24 and September 30, 1991, beginning with the co-conspirators' efforts to recruit William Linder ("Linder") to assist them in a scheme to import marijuana. These facts came to light because Linder, unbeknownst to the co-conspirators, was a confidential informant working for the government.

Linder had resided in the town of Lajas, Puerto Rico, Papayo Ward, for nearly thirty years. Linder's occupation at the relevant time was selling oysters from a kiosk adjacent to Salvi's Tire Center (the "Tire Center"). The Tire Center, as well as the adjacent kiosk, was owned by Appellant José Salvador Andújar ("Andújar"), whom Linder had known for approximately twenty-eight years. Linder had become acquainted with Appellant Pedro Infante–Ruiz ("Infante") because Infante was a frequent customer at his oyster stand. Linder knew Appellant Ama-

---

* Of the District of Rhode Island, sitting by designation.

dor Irizarry–Sanabria ("Irizarry") because he owned a fish market in the nearby town of La Parguera.

On September 24, 1991, while Linder was at the Tire Center, he noticed Infante drive up. After Infante and Andújar had a brief conversation, which Linder could not hear, Andújar told Linder that Infante wanted to see him inside the Tire Center. Infante and Linder met alone in Andújar's office, at which time Infante asked Linder if Linder would use his boat to retrieve a load of drugs from an ocean rendezvous. Linder accepted the proposition, and they agreed to meet later the same day at the Tire Center.

Linder then left the Tire Center and informed Puerto Rico Police Agent Amílcar Vargas ("Agent Vargas") of Infante's illegal offer. Afterwards, he returned to the Tire Center to wait for Infante, who eventually arrived with Irizarry. Infante then drove them to a house located in the direction of Barrio Joyuda (the "Barrio Joyuda House"), where Federico Francisco de la Paz (a.k.a. "Freddie") was waiting. Also present were two Colombian nationals, Alberto Enrique Pineda–Wissman ("Pineda") and an unidentified individual. Andújar was not present at this meeting.

Pineda proceeded to sketch out the plans for the off-shore drug pick-up. The plan called for Linder to take his boat to a location near Mona Island, where he would retrieve the drugs from a speed boat called "La Colombiana." Pineda provided Linder with a crude map of Mona Island, the coordinates for the intended rendezvous point, and a list of the radio frequencies on which the co-conspirators planned to communicate.

Because Linder was unsatisfied with the map of Mona Island, Infante instructed Irizarry to get him a nautical chart. Irizarry and Linder then proceeded to Lucas Marine Shop in Cabo Rojo, where they purchased a nautical ruler, and La Pescadería Rosa, where they found an appropriate chart. Irizarry paid for both items.

On their way back to the Barrio Joyuda House, Irizarry informed Linder that he was to pick up a 3,000 pound load of marijuana and offered him $100,000 for his efforts. At the Barrio Joyuda House, Linder was given $800 to purchase supplies for the trip. Linder then left the house and bought the necessary supplies. Before he returned home, he briefed Agent Vargas on the day's events.

The following day, September 25, 1991, Linder went to the Tire Center, where Andújar instructed him to return the following day to meet Infante. The next day, as instructed, Linder returned to the Tire Center. Infante was late for the scheduled meeting, so Andújar, at Linder's request, called Infante's cellular phone to determine his whereabouts. After the call, Andújar assured Linder that Infante would arrive soon. Shortly thereafter, accompanied by Irizarry, Infante drove through the Tire Center's back entrance. Infante ordered Linder to get in the vehicle quickly so that he would not be seen. Before proceeding to the Barrio Joyuda House, Infante instructed Andújar to move Linder's car from the front to the back of the Tire Center.

When Linder, Infante, and Irizarry arrived at the Barrio Joyuda House, the same group present at the September 24 meeting was already assembled. They discussed revisions in the plans, and Linder told the group that he would require a gun if he was to make the journey alone. After a brief consultation with Infante and Freddie, Irizarry left the house and returned shortly with a .357 Ruger revolver, which he gave to Linder. After the meeting dissolved, Linder met with the local police, who copied the weapon's serial number.

Before his departure on the evening of September 26, Linder met with Lt. González, a local police officer, and Drug Enforcement Administration agent José Morales ("Agent Morales"). Linder informed them of the specifics of his trip, and the three agreed to meet the following day at a spot near Mona Island. Linder surrendered the revolver to the officers at this time.

Linder arrived at Mona Island on the morning of September 27. He was met later that day by Lt. González, Agent Morales, and several other law enforcement personnel. Linder left that night for the rendezvous, which was scheduled to take place the following afternoon.

Although Linder arrived at the rendezvous point at the appointed hour, the Colombian boat was nowhere to be seen. The boat never appeared, and attempts to communicate with it by radio were unavailing. It was close to midnight when Linder finally decided to head back to Mona Island. The seas were rough, and he was having engine and radio problems. Eventually, his engine quit altogether. Linder's boat remained adrift until a large tug boat stopped to help and called the Coast Guard for assistance. The Coast Guard arrived and brought Linder on board. Although they tried to tow his boat back to Mona Island, it sank along the way.

When Linder eventually arrived back at La Parguera, he recounted the events to Irizarry, who explained that the Colombian boat had suffered engine problems and had been unable to make the trip. During the following days, Linder and the co-conspirators met at the Tire Center, where they assured him that they would get him another boat. Infante cautioned Linder not to tell anyone about the failed mission and specifically told him not to communicate over the telephone. Instead, Infante instructed Linder, "Anytime you want to say something to me, tell [Andújar]. [Andújar] will call me and I get with you [sic]."

Several days later, while Linder was at the oyster kiosk, Andújar told him, "My friend came to pick up the gun. He was looking for the gun. I told him he better go to Mona Island and look in the mouth of a shark, and he might find it."

Subsequently, the appellants were indicted and convicted in federal court on charges of conspiracy to import marijuana and possession of a firearm in relation to the commission of the offense.

## II. SUFFICIENCY OF THE EVIDENCE

Both Andújar and Irizarry allege that the proof at trial was insufficient to support their convictions.

### A. *Standard of Review*

■ The standard of review governing a challenge to the sufficiency of the evidence is well established. An appellate court must determine whether a rational jury could find guilt beyond a reasonable doubt. *Echeverri*, 982 F.2d at 677; *United States v. Garcia*, 983 F.2d 1160, 1163–64 (1st Cir.1993). In making this determination, the reviewing court must examine the evidence, together with all inferences that may be reasonably drawn from it, in the light most favorable to the prosecution. *Echeverri*, 982 F.2d at 677. Furthermore, the reviewing court does not evaluate witness credibility, but resolves all credibility issues in favor of the verdict. *Garcia*, 983 F.2d at 1164 (quoting *United States v. Batista–Polanco*, 927 F.2d 14, 17 (1st Cir.1991)). "The evidence may by entirely circumstantial, and need not exclude every reasonable hypothesis of innocence; that is, the factfinder may decide among reasonable interpretations of the evidence." *Batista–Polanco*, 927 F.2d at 17. Nevertheless, "[i]f the 'evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged,' this court must reverse the conviction. This is so because ... where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the verdict, 'a reasonable jury *must necessarily entertain* a reasonable doubt.'" *United States v. Sánchez*, 961 F.2d 1169, 1173 (5th Cir.) (citations omitted), *cert. denied*, —— U.S. ——, 113 S.Ct. 330, 121 L.Ed.2d 248 (1992). With the scope of our review thus defined, we move to the appellants' claims.

### B. *Conspiracy*

■ To establish a conspiracy conviction, the prosecution must prove, *inter alia*, that the defendant entered an agreement to commit the substantive offense, and that the defendant was a voluntary participant in the conspiracy. *Echeverri*, 982 F.2d at 679. The government must prove that the defendant possessed both "intent to agree and intent to commit the substantive offense." *Garcia*, 983 F.2d at 1165 (citation omitted). However, "[d]ue to the clandestine nature of criminal conspiracies, the law recognizes that the illegal agreement may be either 'express or

tacit' and that a ' "common purpose and plan may be inferred from a development and collocation of circumstance." ' " *United States v. Sánchez*, 917 F.2d 607, 610 (1st Cir.1990) (citations omitted), *cert. denied*, 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991). "Mere presence at the scene and close association with those involved are insufficient factors alone; nevertheless, they are *relevant* factors for the jury." *Sánchez*, 961 F.2d at 1174 (5th Cir.) (citation omitted) (emphasis in original).

■ Irizarry maintains that the evidence against him is insufficient because it consisted only of Linder's uncorroborated testimony. While it is true that much of the government's evidence consisted of the largely uncorroborated testimony of the confidential informant, Linder, Irizarry's argument fails nevertheless. As we noted above, an appellate court reviewing the sufficiency of the evidence must resolve all credibility determinations in favor of the verdict. This rule of appellate review applies equally when the evidence centers on the uncorroborated testimony of a confidential informant, so long as the testimony is not " 'incredible or insubstantial on its face.' " *United States v. Gómez–Pabón*, 911 F.2d 847, 853 (1st Cir.1990) (holding that evidence was not rendered insufficient merely because it consisted largely of the uncorroborated testimony of a paid informer) (quoting *United States v. Aponte–Suárez*, 905 F.2d 483, 489 (1st Cir.1990)).

Given that we resolve any credibility issues in favor of the verdict, we find that Irizarry's sufficiency-of-the-evidence challenge fails because the record contains ample support for his conspiracy conviction. A reasonable jury could infer from Linder's testimony that Irizarry was deeply involved in the entire operation. According to Linder, Irizarry was present at the Barrio Joyuda House when the Colombians discussed the radio frequencies, code names, and coordinates that would be used for the drug run. Moreover, Irizarry procured the firearm for Linder and offered Linder $100,000 for his services in retrieving the marijuana from the off-shore rendezvous with the Colombians. A jury hearing this evidence could reasonably conclude that Irizarry was a voluntary partici-

pant in an unlawful scheme to import marijuana. We therefore conclude that the evidence was sufficient to convict Irizarry of conspiracy to import narcotics.

■ Andújar also maintains that his conspiracy conviction is unsupported by the record. Specifically, he claims that the evidence at trial showed no more than "mere presence" at the Tire Center. Recently, we noted that "the culpability of a defendant's presence hinges upon whether the circumstances fairly imply participatory involvement. In other words, a defendant's 'mere presence' argument will fail in situations where the 'mere' is lacking." *Echeverri*, 982 F.2d at 678. Upon a thorough scrutiny of the record, we find that the evidence is insufficient to establish anything more than Andújar's mere presence throughout the conspiracy. That is, the evidence is insufficient as a matter of law to have permitted a jury to conclude beyond a reasonable doubt that Andújar was a voluntary participant in the importation conspiracy.

■ The evidence relating to Andújar's alleged participation in the conspiracy can be fairly summarized as follows: According to Linder, Andújar arranged the original meeting between Linder and Infante, during which Infante asked Linder to participate in the marijuana importation scheme. Though Andújar was not present, he allowed Infante to talk privately with Linder in his office at the Tire Center. No evidence was presented as to whether Andújar knew the subject matter of this conversation. Andújar also orchestrated the September 26 meeting between Linder and Infante, and when Infante was late for this meeting, Andújar called Infante's cellular phone and informed him that Linder was waiting at the Tire Center. When Infante arrived, he ordered Andújar to move Linder's car to the back of the Tire Center. Following Linder's ill-fated voyage to Mona Island, the co-conspirators used Andújar's Tire Center several times to meet and discuss their plans. Linder testified that during one of these meetings Andújar had remarked, "My friend came to pick up the gun ... and I told him that he better go to Mona Island and look in the mouth of a shark, [and] he might find it." After Lin-

der's boat had sank, Infante ordered Linder to refrain from using the phone to contact him. Instead, he told Linder, "Any time you want to say something to me, tell [Andújar]. [Andújar] will call me and I get [sic] with you."

 The prosecution was required to prove beyond a reasonable doubt that Andújar was a voluntary and knowing participant in the conspiracy. More specifically, the government had to establish (1) that Andújar intended to agree to the importation scheme and (2) that he intended to import marijuana into the United States. From the evidence presented, a jury could permissibly infer that, at least after the fact, Andújar was aware of many of the details of the bungled attempt to import marijuana. The evidence is insufficient, however, to permit the jury to have found that Andújar had the requisite specific intent to import marijuana. Although Andújar arranged several meetings between Linder and Infante, Andújar was not present at any of the co-conspirators' critical planning meetings at the Barrio Joyuda House. In fact, the prosecution did not introduce any evidence suggesting that Andújar was aware that the meetings concerned a pending drug deal. We realize, of course, that after-the-fact knowledge of an illegal conspiracy and presence at the operative locations are relevant factors for the jury to consider. Nevertheless, these factors alone are insufficient to establish a conspiracy conviction.

We do not look at the record through rose colored lenses; rather, we canvass the record dispassionately, and base our decision on proven facts, leaving aside undue speculation. While Andújar's actions are consistent with those of a low level participant or "middleman" in the importation scheme, they do not demonstrate his participation with the certainty necessary for a criminal conviction. Andújar's actions, when seen in light of the events following Linder's voyage, offer equal support to both Andújar's mere presence theory and the prosecution's theory that Andújar was knowingly acting as a facilitator and go-between in the conspiracy, which of course constitutes participatory involvement.

In this circumstance, we must find that the evidence was insufficient to sustain the conviction. When a jury is confronted, as here, with equally persuasive theories of guilt and innocence it cannot rationally find guilt beyond a reasonable doubt. We therefore vacate Andújar's conviction for conspiracy to import marijuana.

## C. *The Firearm Conviction*

 Andújar also alleges that the evidence against him is insufficient to support his conviction for possession of a firearm in relation to the commission of a narcotics offense, in violation of 18 U.S.C. § 924(c)(1).[1] We agree. Section 924(c)(1) provides sentencing enhancements if a defendant "during and in relation to any crime of violence or drug trafficking crime[,] . . . uses or carries a firearm." 18 U.S.C. § 924(c)(1). "By its terms, the statute requires the prosecution to make two showings. First, the prosecution must demonstrate that the defendant 'use[d] or carrie[d] a firearm.' Second, it must prove that the use or carrying was 'during and in relation to' a 'crime of violence or drug trafficking crime.' " *Smith v. United States,* — U.S. —, —, 113 S.Ct. 2050, 2053, 124 L.Ed.2d 138, 147 (1993).

Both elements are absent here. First, there is no evidence that Andújar used or carried the gun the conspirators gave to Linder. Second, there was insufficient evidence to convict Andújar of a crime of violence or drug trafficking crime. Consequently, liability under § 924(c)(1) is inapplicable. Accordingly, we vacate his conviction for the § 924(c)(1) firearms count as well.

## III. JURY INSTRUCTIONS

 Both Irizarry and Infante challenge the jury instructions given by the district court. However, because neither appellant raised an objection to the jury charge at trial, we review the instructions only for plain error, that is, " 'errors so shocking that they seriously affect the fundamental fairness and basic integrity' of the trial." *United States v. Mejia–Lozano,* 829 F.2d 268, 272 (1st Cir.1987) (citation omitted); *see also*

1. For reasons unknown, the government failed to address this issue in its brief on appeal.

Fed.R.Crim.P. 30 and 52(b). We gauge each challenged instruction in the context of the charge as a whole, not in isolation. *United States v. Boylan*, 898 F.2d 230, 244 (1st Cir.1990).

## A. *Definition of Reasonable Doubt*

Irizarry contends that the court's instructions regarding the definition of reasonable doubt constituted plain error. The court instructed the jury that:

> a reasonable doubt is a doubt based upon reason and common sense. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to act upon it.

. . .

> So if you, the jurors, after a careful and impartial consideration of all the evidence in the case have a reasonable doubt, it means, then, that you would hesitate to act and find the defendants guilt [sic] of the charge, and if that happens, therefore, you must acquit.

■ We have repeatedly warned against attempting to define reasonable doubt, noting that "[m]ost efforts at clarification result in further obfuscation of the concept." *United States v. Campbell*, 874 F.2d 838, 843 (1st Cir.1989) (citations omitted). Further, "[m]any definitions reduce the burden of proof on the government by expanding the degree of doubt permissible, and consequently such definitions result in increased appellate litigation." *Id.* (citations omitted). Nevertheless, a district court does not necessarily commit reversible error by attempting to define the concept of reasonable doubt for the jury. *See United States v. Rodríguez–Cardona*, 924 F.2d 1148, 1160 (1st Cir.), *cert. denied*, 502 U.S. 809, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991). "[O]ur experience has been that even imperfect formulations usually meet constitutional requirements when viewed in the context of the entire charge." *Watkins v. Ponte*, 987 F.2d 27, 32 (1st Cir. 1993) (citation omitted). Therefore, appellate courts must tolerate a reasonable range of expression. *Id.*

■ When evaluating a district court's definition of reasonable doubt, an appellate court's ultimate concern is whether the instruction has a tendency to reduce the government's burden of proof at trial. *See United States v. Nolasco*, 926 F.2d 869, 871 (9th Cir.) ("The challenge confronting a court that would define reasonable doubt is to avoid language that may 'mislead the jury into finding no reasonable doubt when in fact there was some.'"), *cert. denied*, 502 U.S. 833, 112 S.Ct. 111, 116 L.Ed.2d 80 (1991) (quoting *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954)). "A criminal defendant is entitled to an instruction that '"adequately apprise[s] the jury of the reasonable doubt standard."'" *Campbell*, 874 F.2d at 842 (citation omitted). The United States Supreme Court has suggested that an acceptable definition would define reasonable doubt as "the kind of doubt that would make a person hesitate to act." *Holland*, 348 U.S. at 140, 75 S.Ct. at 138. Deviations from the "hesitate to act" language have often constituted reversible error, especially where the language likens reasonable doubt to doubt which would cause one to *act*, rather than *hesitate to act*. *See, e.g., United States v. Noone*, 913 F.2d 20, 29 n. 14 (1st Cir.1990), *cert. denied*, 500 U.S. 906, 111 S.Ct. 1686, 114 L.Ed.2d 81 (1991); *United States v. Colón–Pagán*, 1 F.3d 80, 81 (1st Cir.1993) (Where the court defined "guilt beyond a reasonable doubt" as "proof of such a convincing character that a person … would be willing to rely and act upon it," it committed plain error because the instruction may have given the jury the incorrect impression that it could convict the defendant "upon the basis of evidence no stronger than might reasonably support a decision to go shopping.").

■ In *Noone*, 913 F.2d at 29 n. 14, we approved an instruction nearly identical to the one under consideration here, and noted that the contested language was essentially the converse of the accepted "hesitate to act" formulation. The instruction here says that "a reasonable doubt is a doubt based upon reason and common sense. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable

person would not hesitate to act upon it." The Supreme Court has suggested that a reasonable doubt is one which would cause a reasonable person to hesitate to act. As we noted in *Noone*, the language here is essentially the converse of the Supreme Court's formulation—that is, if a reasonable doubt makes a reasonable person hesitate to act, proof beyond a reasonable doubt is proof upon which a reasonable person would not hesitate to act. While we are concerned with all district court efforts to define reasonable doubt, especially those that deviate from the Supreme Court's "hesitate to act" language, we nevertheless do not find that the present formulation impermissibly shifted the government's burden of proof. This conclusion is buttressed by the fact that the jury instructions also included the permissible "hesitate to act" language. The court instructed: "So if you, the jurors, after a careful and impartial consideration of all the evidence in the case have a reasonable doubt, it means, then, that you would hesitate to act ... and if that happens, therefore, you must acquit." This instruction tracked the Supreme Court's formulation, and, consequently, it decreased the likelihood that the instructions, as a whole, mislead the jury. We think these instructions, as a whole, adequately apprised the jury of the gravity of the proof-beyond-a-reasonable-doubt standard, and, therefore, we cannot say that the instruction was plainly erroneous.

### B. *Reference to "Guilt or Innocence"*

■ Infante argues that the district court's reference to the defendants' "guilt or innocence" in the jury instructions constituted plain error.

The jury instructions at issue read as follows:

I caution you[,] members of the jury[,] that you are here to determine the guilt or innocence of the accused from the evidence in the case. You know that these defendants are not on trial for any other act or any other conduct that is not alleged in this Indictment.

Neither are you called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial here.

So you are not being asked to decide the case of Felipe Francisco or the case of Mr. Pineda–Wissman.

Infante claims that the references to the "guilt or innocence" of the defendants diminished the presumption of innocence and impermissibly reduced the government's burden of proof at trial. He contends that the language may have confused the jury as to the proper standard of proof, noting that a defendant is never required to prove his innocence. He points out that jurors are called upon only to decide whether the prosecution has proven the defendant guilty beyond a reasonable doubt, not whether the defendant is innocent.

We have previously warned district courts against using a "guilt or innocence" comparison. *United States v. Mendoza–Acevedo*, 950 F.2d 1, 4 (1st Cir.1991). Faced with nearly identical jury instructions, we noted that "[w]hen a court repeatedly tells jurors that the question is one of guilt or innocence, it risks undercutting the government's burden by suggesting that they should find the defendant guilty if they think he is not innocent—regardless of how convincing the government's proof has been." *Id.* We repeat here that, due to the risks of misleading the jury, district courts should refrain wherever possible from using a "guilt or innocence" comparison in their jury instructions.

■ Despite this admonishment, however, we need not reverse the defendants' convictions. As in *Mendoza–Acevedo*, our review of the entire charge convinces us "that any confusion engendered by the inappropriate references to 'guilt or innocence' was offset by the court's careful and clear discussion of the presumption of innocence and the government's burden of proof." *Id.* (citations omitted). The court informed the jury that "[t]he law presumes a defendant to be innocent of a crime. Thus, a defendant, although accused, begins the trial with a clean slate." It further charged the jury that "the presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after a careful and impartial consideration of all the evidence in the case." In closing, the court instructed the jurors

that "[if they], after a careful and impartial consideration of all the evidence in the case[,] have a reasonable doubt, it means ... [they] must acquit." These instructions were adequate to ensure that the jury was informed of the government's burden of proof at trial and of the presumption of innocence cloaking criminal defendants. We, therefore, can find no plain error in the district court's jury instructions.

## IV. INFANTE'S SENTENCING GUIDELINES CHALLENGE

Infante claims that the district court misapplied the United States Sentencing Guidelines in determining his sentence. Specifically, he contends that the district court erred when it found that he was a "leader or organizer" and consequently added four points to his base offense level, pursuant to U.S.S.G. § 3B1.1(a).[2]

█ Factbound matters related to sentencing, such as the district court's determination of a defendant's "role in the offense," need only be supported by a preponderance of the evidence and will be set aside on appeal only for clear error. *United States v. Corcimiglia*, 967 F.2d 724, 726 (1st Cir.1992).

The Guidelines suggest that the sentencing court should consider the following factors when determining whether the defendant was a leader or organizer:

[T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n. 4).

█ Infante contends that he could not have been the leader or organizer because the entire deal was clearly run by Francisco de la Paz. This contention, however, overlooks the fact that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, comment. (n. 3). Our review of the record convinces us that although Francisco de la Paz may have been running the show, the district court did not commit clear error in determining that Infante had a leadership role in the operation. After the sentencing hearing, the district court stated:

I am now more convinced than ever, after having heard the testimony of Mr. Pedro Infante, that Mr. Pineda served as the intermediary. He was the person who had the contacts. The drug deal was being arranged, mainly, mainly on behalf of Francisco de la Paz, also known as Freddy.

His personal contact, or principal man, was Mr. Infante–Ruiz, and in that sense he was the leader, a leader and organizer. [T]his defendant [Infante] assumed a leader/organizer role in the commission of the instant offense as he negotiated the importation scheme with the Colombian drug source through an intermediary who is also a codefendant, was aware at all times as to the logistical elements of the intended importation scheme, recruited at least one of the codefendants to take charge of the supportive services to include securing the boat, captain, and individuals to assist in the importation, storage, and subsequent distribution of the marijuana load, and, finally, provided payments to the confidential informant to assure readiness of the vessel to be used in the rendezvous with the mother ship.

We find that the district court's factual conclusions are supported by the record and fully justify its determination that Infante was a leader or organizer in the conspiracy. We therefore affirm Infante's sentence.

## V. THE EVIDENTIARY RULING

Irizarry contends that the district court abused its discretion when it excluded the testimony of defense witness Humberto Hernández–López ("Hernández"). In order to impeach Linder's credibility, the defense intended to have Hernández testify regarding

2. U.S.S.G. § 3B1.1 states:

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

an incident in which Linder had allegedly broken a promise he had made to Hernández. The incident involved Linder's alleged failure to pay for some fishing nets that he had apparently purchased from Hernández on credit. Although the jury had already learned of the incident through the defense's cross-examination of Linder, the defense desired to have Hernández testify as to his version of the event.

It is well settled that a party may not present extrinsic evidence of specific instances of conduct to impeach a witness on a collateral matter. *United States v. Tejada,* 886 F.2d 483, 487 (1st Cir.1989); Fed.R.Evid. 608(b).[3] "A matter is considered collateral if 'the matter itself is not relevant in the litigation to establish a fact of consequence....'" *United States v. Beauchamp,* 986 F.2d 1, 4 (1st Cir.1993) (quoting 1 *McCormack on Evidence* § 45, at 169 (4th ed. 1992)).

Here, the incident relating to the fishing nets was only relevant to impeach the credibility of Linder. It was irrelevant to the substance of the case—the conspiracy and firearms charges—and was, therefore, a collateral matter. Consequently, the district court did not abuse its discretion when it excluded the testimony of Hernández and limited discussion of the fishing net incident to the defense's cross-examination of Linder.[4]

## VI. CONCLUSION

For the foregoing reasons, Andújar's convictions are *vacated.* All other convictions are *affirmed.*

---

**3.** Rule 608 provides in part:

(a) *Opinion and reputation evidence of character.* The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness....

(b) *Specific instances of conduct.*—Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or

untruthfulness, be inquired into on cross-examination of the witness....

**4.** Irizarry also contends, in the alternative, that Hernández should have been allowed to offer opinion and reputation testimony regarding Linder's character for truth and veracity. The district court excluded this testimony after it concluded that Hernández was "not really acquainted with Linder" and thus lacked sufficient knowledge to proffer an opinion of Linder's character. This conclusion contains adequate support in the record and does not constitute an abuse of discretion.