<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 97-2099

                         UNITED STATES,
                           Appellee,

                               v.

                       FIDEL A. MORILLO,
                     Defendant, Appellant.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

        [Hon. Salvador E. Casellas, U.S. District Judge]

                      ____________________

                             Before

                     Boudin, Circuit Judge,
Schwarzer, Senior District Judge,
and Saris, District Judge.

                     _____________________

    Edgardo Rodrguez-Quilichini, Assistant Federal Public
Defender, with whom Joseph C. Laws, Jr., Federal Public Defender,
was on brief, for appellant.
    Desire Laborde-Sanfiorenzo, Assistant United States Attorney,
with whom Guillermo Gil, United States Attorney, Jos A. Quiles-
Espinosa, Senior Litigation Counsel, and Camille Vlez-Riv,
Assistant United States Attorney, were on brief, for appellee.

                      ____________________

                       October 13, 1998
                     ____________________

         SARIS, District Judge.  Appellant Fidel Morillo was arrested
along with five others in connection with the seizure of three
kilos of cocaine from drug couriers in the San Juan, Puerto Rico
airport.  At trial, the government contended that Morillo's role
in the conspiracy was to allow his alleged co-conspirators to use
his apartment as the operational center of the drug conspiracy.  
A jury convicted Morillo of conspiracy in violation of 21 U.S.C.
846 but found him not guilty of possession of cocaine with
intent to distribute in violation of 21 U.S.C.  841 and 18
U.S.C.  2.  His sole argument on appeal is that the evidence
against him was insufficient to support a conviction and that,
therefore, the trial judge should have allowed his motion for
acquittal.  After a careful review of the record, we now reverse,
although we agree with the trial judge that this is a close case.
I.  FACTUAL BACKGROUND
         We summarize the relevant facts, "interpreting the record in the
light most helpful to the government."  United States v.  Ortiz,
966 F.2d 707, 710 (1st Cir. 1992).
         In April 1996, Fidel Morillo leased an apartment located at HY-1,
252 Street, in the "Country Club" neighborhood of Carolina,
Puerto Rico ("HY-1").  It is near the San Juan airport.  Morillo
had been experiencing marital difficulties and moved into HY-1
with his mistress, Felicia Santos.  At the inception of the
lease, Morillo was given the only key to the apartment.  The
small apartment, furnished by Morillo, had a living room, a
kitchen and a bedroom, which was separated from the living room
by a door.  Morillo, who worked as an installer at a water heater
supply company, stopped spending the night at the apartment in
mid-August 1996, when he moved back to his wife's house.  
However, he made rent payments on HY-1 through October 1996.  
Santos continued to live in the apartment until early- to mid-
September 1996, when she went to New York for about fifteen days.  
During that period, landlord Ysidro Fernndez, who lived in an
attached house, only saw Morillo's truck at the apartment once or
twice.  Santos returned briefly on October 2, only long enough to
tell the landlord that she was leaving permanently to return to
her native Santo Domingo, Dominican Republic.  
    Also on October 2, co-conspirators Fiordaliza Durn and Rosa
Peguero flew from John F. Kennedy Airport in New York to San Juan
for the purpose of transporting cocaine from Puerto Rico back to
New York.  Two brothers, co-conspirators Eddison and Hanzel
Nez, picked the women up at the San Juan airport early that
evening and brought them to HY-1.  Hanzel Nez let the women
into the apartment with a key.  No one was in the apartment when
Durn and Peguero were dropped off there, without their luggage,
and they slept together in the single unoccupied bedroom.
    At approximately 9:00 or 9:30 the next morning, October 3,
Morillo knocked on the apartment door of HY-1.  Peguero, who had
met Morillo in September 1996 when she previously stayed in the
apartment, opened the door and let Morillo in.  Morillo changed
into some clothes that were kept in the bedroom closet.  Durn,
who had never met Morillo, was wearing a man's shirt that she had
obtained from the bedroom closet, and she told him she did not
know "to whom it belongs."  Morillo told Durn it was his shirt
but that she could keep it because it did not fit him anymore.  
Morillo used the telephone in the living room briefly and then,
at Peguero's request, took her to a nearby bodega for cigarettes
in a large red van.  After taking Peguero back to HY-1, Morillo
left the apartment.  There is no evidence that there were drugs
or paraphernalia in plain view anywhere in the apartment during
Morillo's October 3 visit.  Also, there is no evidence that
Morillo spoke with Peguero or Durn, both of whom testified at
trial, about the purpose of their sojourn.
    Morillo did not return to HY-1 or have any other contact with the
two women or the Nez brothers on October 3.  The brothers
stopped by HY-1 after Morillo's visit and were in and out
throughout the day along with an unidentified man.  At some
point, they brought to HY-1 another woman, co-conspirator
Altagracia Domnguez, who was a cousin of Morillo's mistress,
Santos.  Like Peguero, Domnguez had been at the apartment during
her September visit to Puerto Rico.  During the day, the Nez
brothers assisted the couriers with arrangements to return to New
York, including visits to several travel agents.  The brothers
took the women to a shopping mall and met them later that evening
for dinner.  Morillo did not participate in any of these
activities.  Domnguez slept in HY-1 with Durn and Peguero on
the night of October 3.  The men slept elsewhere.
    Between 9:00 and 10:00 a.m. on October 4, the Nez brothers and
the other man returned to HY-1 with luggage and a black bag
containing the drugs.  The three men went into the bedroom, took
out three kilogram bags of cocaine, and prepared them for
transportation to New York with transparent paper, tape and
Vaseline.  At least one of the men and Domnguez secured the
packages of cocaine to the thighs of Durn and Peguero.  
Domnguez was scheduled to return to New York with more drugs
later that afternoon.  The drug paraphernalia, cellophane wraps,
tape and a calling card covered with white powder residue were
scattered in plain view throughout the bedroom on the bed and the
bureau as the women prepared to leave the apartment.  
    At about 10:00 or 10:30 a.m. on October 4, Morillo went to the
house physically attached to HY-1 to see Fernndez, the landlord
and Morillo's trusted co-worker and friend.  Morillo asked
Fernndez if he could borrow Fernndez' car, a late-model green
Hyundai, to go to their workplace because his vehicle was in the
shop.  Morillo left the building in the Hyundai for approximately
half an hour and returned the car at about 11:00 a.m.  While he
was gone, Fernndez walked through an unlocked door into the
living room of HY-1, as was his custom, to get something from the
refrigerator.  He saw one "fat" man, whom he did not recognize,
sleeping on the living room couch.  When Morillo returned in the
Hyundai, he gave the car keys back to Fernndez.   
    Sometime around 11:00 a.m., after the drugs were attached to the
couriers and just as Eddison Nez was preparing to take the two
women to the airport, Morillo stopped by HY-1 itself for the
first time since his brief visit the previous day.  As Morillo
walked into the living room, he said in Spanish, "Oh, las
muchachas se van ya?" or "Are the girls leaving now?"  
Immediately thereafter, Eddison Nez, Durn and Peguero left the
apartment in a green Mitsubishi Mirage.  When they left for the
airport, the door to the bedroom was open.  Morillo remained in
the apartment with Hanzel Nez, Domnguez and the other man.  He
was not present when the drugs were prepared, packaged, and put
on the "mules." Only five to eight minutes after he had returned
with the Hyundai, Morillo went back to the attached house to ask
Fernndez for a ride in the Hyundai to pick up Morillo's red
pickup truck at the shop, where he and his wife had left it
earlier that day.  Fernndez said he could not go with Morillo,
but he let him re-borrow the Hyundai.   Meanwhile, at approximately
11:10 a.m., federal agents began following the Mitsubishi a short
distance from the apartment at another house, where Eddison Nez
had stopped to pick up a plane ticket.  They went directly to the
San Juan airport from the house.  At approximately 11:20 a.m.,
Durn and Peguero got out of the car at the airport, and Eddison
Nez drove away.  Durn and Peguero were stopped and then
questioned, searched and arrested in the airport's DEA office.  A
total of three kilos of cocaine was seized from the two women,
along with two plane tickets from San Juan to Kennedy Airport.  
Agents followed the Mitsubishi after it left the airport, but
they stopped following it or lost the car between noon and 12:20
p.m.
    At around 12:30 p.m., agents spotted the Mitsubishi near the
point where they had lost contact with it.  The car was stopped
in front of a travel agency about 1000 meters from HY-1, and the
agents saw Domnguez get into the car.  They stopped the
Mitsubishi after it drove away and placed Hanzel Nez and
Domnguez, the only occupants of the car, under arrest.  During
the stop and arrest, agents recognized Eddison Nez riding by
the scene in the passenger seat of Fernndez' Hyundai.  The
agents put on their car's siren and signaled the Hyundai to pull
over.  Then Eddison Nez looked behind him and, seeing the
police officer in the middle of the street aiming a pistol at the
Hyundai from a range of ten feet, motioned to the car's driver,
Morillo, to continue driving.  Morillo slowed the car but drove
approximately fifty meters before he stopped.  Both Morillo and
Eddison Nez were arrested on the scene.
    Tracing the Hyundai back to HY-1, the police arrived at the
apartment around 3:00 p.m. and found both the front and back
doors open.  They searched Fernndez' house with his consent and,
pursuant to a search warrant, searched the apartment on the
evening of October 4 after 10:00 p.m.  They seized Morillo's work
beeper and his personal telephone book from the living room.  
There were also two phone bills, one under Santos' name dated
August 22, 1996.  The police seized some transparent paper, tape
and a jar of Vaseline (in a Walgreen's bag), which were all still
in plain view on the bed and bureau in the bedroom.  They also
seized a phone card, dusted with white residue, from the top of a
bureau, which was also sprinkled with that powder, and an
electronic scale from the bedroom closet.  Finally, police found
two more kilos of cocaine, together with more drug paraphernalia,
under the bed in the bedroom, wrapped in a woman's robe or
nightgown.  Domnguez' bag and clothes were still in the bedroom.  
The package of two kilos of cocaine could not be seen without
lifting two mattresses and disrobing them.  The door to the
bedroom was closed at the time the police entered.  The bedroom
was in the same condition at the time of the search as it was
when Peguero and Durn left for the airport.  A videotape of the
appearance of the apartment at the time of the search was
introduced into evidence and played for the jury.
    Morillo, the Nez brothers, Domnguez, Durn and Peguero were
indicted on one count of conspiracy to distribute cocaine and one
count of possession of cocaine with intent to distribute.  Durn
and Peguero, pursuant to plea agreements, testified at the joint
trial of Morillo and the Nez brothers in January 1997.  The
Nez brothers were found guilty on both counts of the
indictment.  The jury found Morillo guilty on Count I
(conspiracy) and not guilty on Count II (possession with intent
to distribute).  Although pronouncing it a close call, the trial
judge denied Morillo's motion for acquittal at the end of the
government's case and again after all the evidence was presented.  
Morillo was sentenced to 78 months in prison on August 1, 1997.  
This appeal followed.
II.  SUFFICIENCY OF THE EVIDENCE
    Morillo asserts that the trial judge erred in denying his motion
for acquittal because there was insufficient evidence for a jury
to convict him of conspiracy to distribute cocaine with the Nez
brothers, Peguero, Durn and Domnguez.
    Our review on this single appeal issue is familiar, often
recited, and limited:

         The challenges to the sufficiency of the evidence and to the
         denial of the motion for judgment[] of acquittal raise a single
         issue.  We assess the sufficiency of the evidence as a whole,
         including all reasonable inferences, in the light most favorable
         to the verdict, with a view to whether a rational trier of fact
         could have found the defendant guilty beyond a reasonable doubt.  
         We do not weigh witness credibility, but resolve all credibility
         issues in favor of the verdict.  The evidence may be entirely
         circumstantial, and need not exclude every reasonable hypothesis
         of innocence; that is, the factfinder may decide among reasonable
         interpretations of the evidence.

United States v. Garca, 983 F.2d 1160, 1164 (1st Cir. 1993)
(quoting United States v. Batista-Polanco, 927 F.2d 14, 17 (1st
Cir. 1991) (citations omitted)); see also United States v. Berros, 132 F.3d 834, 841 (1st Cir. 1998).  In making their
decision, jurors "may draw reasonable inferences from the
evidence based on shared perceptions and understandings of the
habits, practices, and inclinations of human beings."  United
States v.  Ortiz, 966 F.2d 707, 712 (1st Cir. 1992).  Therefore,
when assessing a sufficiency challenge, we require jurors neither
"to divorce themselves from their common sense nor to abandon the
dictates of mature experience."  Id.   
    However, in applying their common sense, the jurors cannot
convict unless the evidence is sufficient to find guilt beyond a
reasonable doubt.  See United States v. Valerio, 48 F.3d 58, 64
(1st Cir. 1995).  If the evidence "'viewed in the light most
favorable to the verdict gives equal or nearly equal
circumstantial support to a theory of guilt and a theory of
innocence of the crime charged,' this court must reverse the
conviction.  This is so because . . . where an equal or nearly
equal theory of guilt and a theory of innocence is supported by
the evidence viewed in the light most favorable to the
prosecution, 'a reasonable jury must necessarily entertain a
reasonable doubt.'"  United States v.  Flores-Rivera, 56 F.3d
319, 323 (1st Cir. 1995) (omission  in original) (quoting United
States v. Snchez, 961 F.2d 1169, 1173 (5th Cir. 1992)).  We must
conduct a close review of the record and "reject those
evidentiary interpretations and illations that are unreasonable,
insupportable, or overly speculative."  United States v. Spinney,
65 F.3d 231, 234 (1st Cir. 1995).
    The only crime at issue in this appeal is conspiracy to
distribute narcotics.  21 U.S.C.  846.  "To prove the elements
of the crime of conspiracy, the government must show the
existence of a conspiracy, the defendant's knowledge of the
conspiracy, and the defendant's voluntary participation in the
conspiracy."  United States v. Gmez-Pabn, 911 F.2d 847, 852
(1st Cir. 1990).  Though the government need not prove an overt
act in order to establish a violation of 21 U.S.C.  846, the
fact that a defendant "knew what was going on" is, on its own,
"not enough to establish intent to conspire."  United States v.
O'Campo, 973 F.2d 1015, 1020 (1st Cir. 1992) (quoting United
States v. Ocampo, 964 F.2d 80, 82 (1st Cir. 1992)).  To prove
that the defendant belonged to and voluntarily participated in
the conspiracy, the government must prove two  kinds of intent:
"intent to agree and intent to commit the substantive offense."  
Gmez-Pabn, 911 F.2d at 853 (quoting  United States v. Rivera-
Santiago, 872 F.2d 1073, 1079 (1st Cir. 1989)).  Due to the
clandestine nature of criminal conspiracies,  "[t]he agreement
itself 'need not be express, but may consist of no more than a
tacit understanding.'"  United States v. Echeverri, 982 F.2d 675,
679 (1st Cir. 1993) (quoting United States v. Glover, 814 F.2d
15, 16 (1st Cir. 1987)).
    The government contends that Morillo participated in the drug
trafficking conspiracy by knowingly permitting his apartment to
be used as the operational center for housing the "mules" and for
storing and packaging the cocaine.  When a defendant has
knowledge of a drug trafficking conspiracy, willfully allowing
others to use a dwelling for the drug distribution activity is
sufficient to support a conspiracy conviction.  See Rivera-
Santiago, 872 F.2d at 1080-81 (affirming a conspiracy conviction
where there was direct evidence that the owner of a house agreed
to allow a truckload of marijuana to be stored there); cf. United
States v. Luciano-Mosquera, 63 F.3d 1142, 1150 (1st Cir. 1995)
(providing a house for a meeting at which guns were displayed and
discussed and at which defendant was present supported liability
for substantive crime under an aiding and abetting theory).
    A close review of the trial record reveals that no direct
evidence was submitted to the jury showing that Morillo agreed
that the Nez brothers and the three women could use his
apartment as a base for the drug shipment.  The jury heard
evidence that Morillo had met Peguero and Domnguez previously in
HY-1 in September.  They also heard, however, that Domnguez was
the cousin of Morillo's former mistress, Santos, and that Santos
was still living in HY-1 when Peguero and Domnguez made their
September visit to Puerto Rico.  The government emphasizes Hanzel
Nez' possession of the apartment key as evidence that Morillo
lent his apartment to the conspirators.  Whether Hanzel obtained
the key from Morillo or from the recently departed Santos,
Morillo's comfort level with and hospitality to the others at HY-
1 support the reasonable inference that Morillo had authorized
them to use the apartment, at least with respect to October 3 and
4.  But the reasonable inferences regarding the scope of
Morillo's agreement to lend stop there.  The jury heard no
evidence of any involvement of Morillo in any other aspect of the
conspiracy, such as planning the shipment with the Nez
brothers, handling drugs or buying plane tickets.  Although the
jury could reasonably infer that Morillo authorized the use of
the apartment, there is insufficient evidence connecting that
authorization to the purpose of possessing and distributing
cocaine.  See United States v. Andjar, 49 F.3d 16, 21-22 (1st
Cir. 1995) (reversing the conspiracy conviction of a defendant
who made his office and warehouse available to conspirators and
even arranged meetings between them where there was no proof that
he "was aware that the meetings concerned a pending drug deal"
before the fact).
    Absent evidence of a prior agreement to lend the apartment to the
others in furtherance of the drug conspiracy, the path to a
supportable conviction necessarily begins with the question of
when, if ever, Morillo gained knowledge of the conspiracy based
at the apartment.  Many of our cases in which we have allowed an
inference of knowledge have involved defendants who have actually
lived in the subject apartment during the course of the
conspiracy; in each of these cases, the jury's conclusion that
the defendant knew about the distribution scheme followed almost
inexorably from his or her knowledge of large amounts of drugs or
distribution paraphernalia.  See, e.g., Echeverri, 982 F.2d at
679 (affirming the conviction of a "sole tenant" of a "tiny
apartment" in which drugs, a scale and a ledger were found within
feet of the tenant); United States v. Vargas, 945 F.2d 426, 429-
30 (1st Cir. 1991) (affirming the distribution conspiracy
conviction of a tenant who was the "only tenant and occupant" of
an apartment to which occupant had exclusive access and in which
drugs were found and drug records were in open view); United
States v. Tabares, 951 F.2d 405, 409 (1st Cir. 1991) (affirming
the conspiracy convictions of defendants who paid the rent and
lived in the apartment where drugs and paraphernalia were found
and which was leased in one defendant's name).  Importantly, the
issue in determining knowledge is not whether the drugs or
paraphernalia were "accessible" to the defendant when he was in
the apartment, but rather whether the defendant knew of the
drugs' existence.  See Valerio, 48 F.3d at 64 & n.4 (reversing
the conspiracy conviction of the short-term occupant of an
apartment in which a large cache of drugs was stored out of plain
view).
    Here, the evidence of what Morillo saw in the apartment is
insufficient to support an inference of knowledge of the purpose
of the conspiracy on October 2 or 3.  Morillo had not actually
lived in the apartment for six weeks.  The first time he visited
the apartment during the course of the conspiracy was early in
the day on October 3.  Peguero and Durn were there, without
luggage.  The three kilos destined for their thighs had not yet
been brought to the apartment.  Even if the two kilos in the robe
were under the bed at that time -- and there is no evidence they
were -- those drugs were not in plain view.  Knowledge of that
package cannot be imputed to Morillo.  Morillo went into the
bedroom closet on October 3, where the scale was later found,
but, again, there is no evidence of when the scale was put there.  
Morillo's casualness with the women's presence, his offering his
shirt to Durn, and his taking Peguero for cigarettes, although
suspicious, are insufficient to support an inference of knowledge
on October 3 of a conspiracy to transport three kilos of cocaine
to New York.  Morillo did not come by HY-1 again for at least 26
hours.
    The evidence concerning October 4 paints a different picture.  
Morillo arrived at the apartment as early as 11:00 a.m., just as
Eddison Nez and the couriers were departing for the airport.  
The jury could have reasonably concluded that Morillo knew that
the apartment was being used for drug distribution at that point
because the bedroom door was wide open at the time the
"muchachas" hurried out to the airport.  The apartment was tiny,
and Morillo had belongings in the bedroom.  The bedroom was
littered with drug packaging paraphernalia and cocaine residue,
of which even he, for this purpose a short-term visitor, could be
deemed to have knowledge.  An inference that he knew about the
two kilos still stored under the bed, however, remains
unsupportable by the evidence.  
    The government argues that Morillo's presence at the apartment
during such a "critical juncture" of the conspiracy allowed the
jury to infer prior knowledge of the conspiracy's purpose.  
United States v. Mangual-Corchado, 139 F.3d 34, 47-48 (1st Cir.
1998); United States v. Lema, 909 F.2d 561, 570-71 (1st Cir.
1990).  Because it "runs counter to human experience to suppose
that criminal conspirators would welcome innocent nonparticipants
as witnesses to their crimes," we have accepted that juries may
infer a defendant's culpable involvement from the fact that other
conspirators continued their criminal activity despite the
defendant's arrival in a den of iniquity.  Batista-Polanco, 927
F.2d at 18 (rejecting the hypothesis that participants in a
distribution scheme "would permit a noncontributing interloper"
to remain for 45 minutes in a small apartment "conspicuously
strewn with evidence of a large scale heroin packaging operation
. . . while their conspicuous criminal conduct continued
unabated"); see also Ortiz, 966 F.2d at 712 (observing that
criminals "rarely seek to perpetrate felonies before larger-than-
necessary audiences").  The government's position is essentially
that Morillo's presence during the criminal activity on October 4
allowed the jury to draw an inference of knowing participation
prior to his arrival that day.
    Morillo counters that the jury could not make such an inference
of prior knowledge from his mere presence on October 4.  "Mere
presence at the scene of the crime" or "mere association with
conspirators," Gmez-Pabn, 911 F.2d at 853, is not automatically
sufficient to establish guilt.  Compare Andjar, 49 F.3d at 21-22
(reversing conviction because, despite the defendant's presence
nearby, the government failed to prove that the defendant knew
that conspirators were using his office, which the defendant had
lent them, for a drug conspiracy) with Ocampo, 964 F.2d at 82-83
(holding that evidence that the defendant was living for four to
six months with her trafficking boyfriend in a small apartment
where a beeper, drug paraphernalia and drugs were kept was
insufficient to establish her intent to conspire even though
there was a fair inference that she knew what was going on).  The
ultimate question is always whether the circumstances of the
particular case add up to showing both knowledge and voluntary
participation in a conspiracy beyond a reasonable doubt.  SeeUnited States v. Rogers, 121 F.3d 12, 15 (1st Cir. 1997)
(describing the distinction between "mere" presence and
"culpable" presence).  In this case, if Morillo's knowledge had
been early enough, the evidence would be sufficient to support a
conspiracy conviction because it would support a reasonable
inference that the defendant had made his apartment available
with the intent to facilitate the crime.
    In our opinion, the evidence presented by the government of the
behavior of Morillo and the others is insufficient for a
reasonable factfinder to conclude beyond a reasonable doubt that
Morillo knew about the conspiracy before 11:00 a.m. on October 4,
1996, when it was substantially completed so far as the use of
Morillo's apartment was concerned.  Morillo's spontaneous
statement that "The girls are leaving now" is innocent on its
face and does not support an inference of prior knowledge of the
drug conspiracy.  The conspirators' insouciance about leaving the
bedroom door open with drug paraphernalia conspicuously strewn
about does suggest either that the others knew that Morillo knew
the purpose of the trip or trusted him sufficiently not to clean
up.  However, unlike in cases adhering to the common sense adage
that criminals rarely welcome innocent persons as witnesses to
serious crimes, Morillo was not present during the packaging of
the drugs or the preparation of the couriers.   
    Also, though Morillo was the "sole rent payer," his situation
does not fall neatly into the line of those cases that reject
sufficiency challenges by occupants with "the exclusive right to
control the comings and goings" in an apartment because Morillo,
although the lessee, no longer resided in the apartment and was
rarely there.  Echeverri, 982 F.2d at 678 & n.2 (holding evidence
of conspiracy was sufficient where the defendant was "hardly
powerless to determine who and what could come inside").  
Further, his erstwhile mistress Santos, who was a cousin of one
conspirator and knew at least one other, had been living there
after Morillo moved out in mid-August and had left the country
the very day the conspiracy commenced.  Any inference imputing
knowledge of the distribution conspiracy prior to his visit to
the apartment on October 4 is overly speculative and not
supportable by the evidence and, therefore, must be rejected.  
See Andjar, 49 F.3d at 22 ("[A]fter-the-fact knowledge of an
illegal conspiracy and presence at the operative location are
relevant factors for the jury to consider.  Nevertheless, these
factors alone are insufficient to establish a conspiracy
conviction.").
    Finally, the evidence of voluntary participation by Morillo afterhe gained knowledge is insufficient to support a guilty verdict
beyond a reasonable doubt.  Morillo was arrested while driving
Hernndez' Hyundai with Eddison Nez in the passenger seat after
federal agents broke off their observation of the Mitsubishi that
Eddison Nez had used to take Durn and Peguero to the airport.  
The evidence, taken in the light most favorable to the
government, indicates that Morillo slowed but did not stop and,
at Eddison Nez' urging, drove the car approximately 50 meters
after being signaled to stop by the police, who were in the
process of arresting Hanzel Nez and Domnguez in the Mitsubishi
on the side of the road.  Although the jury was entitled to treat
this sluggish flight as evidence of consciousness of guilt, seeUnited States v. Lpez, 944 F.2d 33, 40 (1st Cir. 1991), the fact
that Morillo was giving Eddison Nez a ride, without any
evidence of conspiratorial purpose, falls short of voluntary
participation in a serious criminal conspiracy.  Even if Morillo
knew of the conspiracy when he was arrested, the government
cannot escape its burden to prove Morillo's intent to agree and
to commit the substantive offense at a time that he had such
knowledge.  Lending one's apartment to others for use as a safe
house for a drug shipment supports a conspiracy conviction.  
Nonetheless, the facts of this case, in which the evidence
presented by the government did not support a fair inference of
knowledge beyond a reasonable doubt until the apartment's use was
all but completed, are insufficient to sustain Morillo's
conviction.
    For these reasons, Morillo's conviction is REVERSED.

</body>

</html>