UNITED STATES, Appellee,

v.

**Manuel Amado GUERRERO, Defendant, Appellant.**

UNITED STATES, Appellee,

v.

**Crispiniano OSPINA, Defendant, Appellant.**

UNITED STATES, Appellee,

v.

**Orlando PILCO, Defendant, Appellant.**

UNITED STATES, Appellee,

v.

**Manuel RIVAS, Defendant, Appellant.**

UNITED STATES, Appellee,

v.

**Dimas HERNANDEZ, Defendant, Appellant.**

**Nos. 96–1324 to 96–1327 and 96–1651.**

United States Court of Appeals, First Circuit.

Heard March 6, 1997.

Decided May 30, 1997.

---

334

Luis E. Pabon Roca by Appointment of the Court, Hato Rey, PR, for defendant, appellant Amado Guerrero.

Peter J. Satz–Hanley by Appointment of the Court, San Juan, PR, for defendant, appellant Crispiniano Ospina.

David A.F. Lewis by Appointment of the Court, Boston, MA, for defendant, appellant Orlando Pilco.

Miguel A.A. Nogueras–Castro, Assistant Federal Public Defender, Gurabo, PR, with whom Gustavo A. Gelpi, Assistant Federal Public Defender, San Juan, PR, and Benicio Sanchez Rivera, Federal Public Defender, Guaynabo, PR, were on brief, for defendant, appellant Manuel Rivas.

Irma R. Valldejuli by Appointment of the Court, San Juan, PR, for defendant, appellant Hernandez.

Jacabed Rodriguez Coss, Assistant United States Attorney, Hato Rey, PR, with whom Jose A. Quiles, Assistant United States Attorney, and Guillermo Gil, United States Attorney, were on brief, for appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

A jury convicted defendants-appellants Manuel Amado Guerrero, Crispiniano Ospina, Orlando Pilco, Manuel Rivas, and Dimas Hernandez each of one count of aiding and abetting each other in the possession with intent to distribute marijuana on board an ocean vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. app. § 1903(a) and 18 U.S.C. § 2. On appeal, the defendants raise various issues with respect to their convictions and sentences. Many of the issues they ask us to review were not properly brought to the district court's attention. Finding no merit to their contentions, we affirm the district court's judgment in all respects.

## I.

### Facts and Prior Proceedings

At trial, the government established the following facts.[1] On the evening of June 13, 1995, the United States Coast Guard Cutter MELLON was conducting routine counter drug-trafficking patrol on the high seas off Colombia, South America. At that time, the weather conditions included twentyknot winds and eight-foot swells. Lt. Comdr. Vincent Morgan Weber commanded the heavily armed 378–foot–long vessel, which was equipped with two smaller boats: a motorized surfboat, the MELLON I, and a rigid hull inflatable boat, the MELLON II.

At approximately 9:00 p.m., forty miles north of the Colombia's Guajira Peninsula, the cutter MELLON made radar contact with an unidentified vessel.[2] As the MELLON approached the craft, it directed its search lights upon it. Given the difficult seas and the distance from the nearest shore, Lt. Comdr. Weber expected to observe a cargo boat. Instead, he discerned a forty-foot long, flagless recreational craft, travelling in a northeast direction.

The boat rode low in the water, not more than eight feet above the surface. Its cabin was constructed much lower than normal for that type of recreational vessel. The vessel's "low profile" enabled it to ride in the ocean's swells and avoid most radar detection. The fiberglass boat's hull was light blue below the waterline and white above. It sported two antennae, a common VHF radio antenna and a high-frequency antenna for long distance communications. The vessel was operating without its running lights on, and no one was topside.

After several unsuccessful attempts to hail the vessel, Lt. Comdr. Weber established radio communications through one of the cutter's interpreters. The vessel's master, Pilco, informed the Coast Guard that the boat, identified as the BLACK CAT,[3] was of Honduran registry. Pilco stated that his last port of call was "Panama" and that his next port of call was "Honduras." Weber found these statements suspicious because the BLACK CAT was headed away from the

---

1. We recount the trial evidence in the light most favorable to the prosecution. *See United States v. Ruiz*, 105 F.3d 1492, 1495 (1st Cir.1997).

2. The evidence also suggested radar contact with another vessel, some two miles away from the first boat, but the Coast Guard chose not to pursue any interaction with that vessel.

3. Pilco stated the vessel's name in Spanish, "GATO NEGRO." Following the parties' lead, we use the English translation throughout.

stated destination and because specific cities, not countries, usually are identified as ports of call. Pilco did not respond to Weber's subsequent request to identify the specific cities in which the ports of call were located.

When asked if the BLACK CAT carried any cargo, Pilco answered, "no." Lt. Comdr. Weber had just been advised, however, that personnel aboard the MELLON saw cargo inside the boat's cabin. The vessel's low position in the water further belied Pilco's claim. To clarify the point, Weber again asked Pilco whether or not the BLACK CAT carried cargo. Pilco again responded in the negative. Weber then requested permission to board, to which Pilco replied, in an agitated voice, "wait a minute, wait a minute, wait a minute." Weber repeated the request a few minutes later, but received the same response.

About the same time, Coast Guard personnel observed someone on the BLACK CAT throwing objects overboard. A boat team dispatched on the MELLON II retrieved from the ocean pieces of a navigational chart depicting the United States Virgin Islands area east of Puerto Rico. Lt. Comdr. Weber then dispatched a boarding team in the MELLON I to approach the BLACK CAT.

When the MELLON I came alongside the vessel, members of the boarding team noticed two oversized, custom-made fuel tanks covering most of the aft deck. In fact, a person could not enter the cabin area without crawling over the fuel tanks. Peering into the cabin area with the aid of a spotlight, the boarding team observed several crew members and numerous whitecolored bales.

The boarding team failed in its initial attempts to get the attention of the crew, which, for a time, remained inside the cabin. Soon, however, the crew members began to emerge, one by one, carrying duffel bags. One member placed his hand underneath his shirt, and others seemed to be reaching inside their bags. These actions alarmed the boarding team, which quickly advised the crew (in Spanish and English) to keep their hands in plain sight. Concerned for the boarding team's safety, Gunner's Mate Edward West pointed an M16 service rifle toward the vessel. Perhaps because the chop-

py seas made communication difficult, the BLACK CAT's crew did not comply with the request to keep their hands in view. When a crew member again began to reach towards his duffel bag, the boarding team pulled away from the BLACK CAT in order to reassess the situation and diffuse the rising tension.

When all five crew members of the BLACK CAT were topside, the MELLON I again pulled up to the vessel. The boarding team had no weapons drawn at the time, and the situation was much calmer. Ensign Joseph Sundland, the boarding officer, told Pilco that the Coast Guard wanted to perform a safety inspection on the boat. Pilco consented. The boarding process, however, proved to be somewhat difficult. There was very little space available on the boat for boarding, and the rough sea conditions had caused fuel to spill on the stern, making for unsure footing. Moreover, the construction of the vessel's cabin left no room to walk around it on deck. These circumstances made it dangerous for the BLACK CAT's crew members, who had no life jackets, to stand topside during the boarding. To facilitate a safe boarding, the boarding team had the crew lie down on top of the cabin.

Once on board, members of the boarding team asked Pilco again if he had any objection to the Coast Guard's presence on board the vessel. Pilco repeated that he had no objection. Sundland asked Pilco for permission to go below into the cabin to check for safety hazards. Pilco consented, and led Ensign Sundland and Firearm Rafael Rivera (who served as interpreter) over the fuel tanks and into the cabin. Numerous bales covered with white plastic filled almost all of the interior space, with the exception of a small sleeping area between the bales and the ceiling and a narrow crawl space forward. One of the bales had been placed by the helm, apparently to serve as a seat for the crew member steering the vessel. The cabin also held many food containers, mostly unopened, and a cooler almost full of fresh ice and sodas. Sundland noticed high-quality, expensive radio gear on the cabin's wall.

The bales emitted no perceptible odor, rather, intense fumes from fuel leaking out of the poorly constructed tanks almost overwhelmed the men in the cabin. Ensign Sundland sought and received Pilco's permission to open one of the bales. He cut through heavy plastic and a cardboard box, and discovered nine individually wrapped packages inside. As he opened one of the smaller, plastic-wrapped packages, he asked Pilco if he knew what the package contained. Pilco answered that he thought it was marijuana and that someone had hired him to take it from Colombia to an undisclosed location. Field testing verified that the packages in fact contained marijuana.

Following a radio inquiry to Honduran authorities, at approximately 9:00 p.m. on June 14 (some twenty-four hours after the Coast Guard initially contacted the BLACK CAT), the Honduran government confirmed the vessel's Honduran registry and authorized the Coast Guard to enforce United States law against the vessel and her crew.[4] The Coast Guard placed the defendants under arrest and seized the contraband. After securing the vessel's crew and cargo aboard the MELLON, the Coast Guard attempted to tow the BLACK CAT in the MELLON's wake, but the BLACK CAT took on water and began to sink. Because the boat's presence just beneath the ocean's surface would have created a navigation hazard, Coast Guard personnel sank the vessel completely with machine gun fire.

In total, the Coast Guard seized 100 bales of marijuana, weighing a total of 5,596 pounds and worth $6–8 million wholesale, $25–41 million retail. Although the Coast Guard found no weapons on board the BLACK CAT, it seized a Magellan global positioning system ("GPS"), an electronic navigation device that determines a vessel's latitude and longitude position. When asked, Pilco could not present any cargo manifests or other commercial papers.

According to the government's witnesses, commercial cargo normally is not transported in the manner in which the unlabeled bales were bundled and arranged on the BLACK CAT. On the contrary, the bales had been packed in a manner typical for contraband. In particular, the evidence suggested that the waterproof packaging was intended to protect the contraband during vessel-to-vessel transfers on the high seas. Transfers of this type often require the assistance of long distance radios and sophisticated navigational equipment, such as the Magellan GPS, to pinpoint the time and place of the rendezvous.

Following the government's case in chief, defendants Pilco and Rivas testified on their own behalf. Pilco asserted that he had been hired to transport what he thought was a coffee cargo—at $5 per bale—to Aruba, and that he set sail roughly around midnight on June 12, 1995. He testified that during the initial contact with the cutter MELLON, he did inform the Coast Guard that the BLACK CAT was carrying cargo. He also claimed that he had told the Coast Guard that his last port of call was "Puerto Panama," located on Colombia's Guajira Peninsula, and that his destination was "Aruba," not "Honduras." He denied telling Ensign Sundland that he thought the bales contained marijuana, and stated that he had no cargo manifests or commercial papers because the person who hired him, rather than a maritime agency, was to receive the shipment.

Rivas testified that he was an experienced seaman who usually worked on merchant ships. For the BLACK CAT voyage, he had been hired for $200 as a helmsman. He stated that he met the rest of the crew for the first time after being driven to Puerto Panama on the Guajira Peninsula. Rivas could not state with any specificity the location of Puerto Panama. He asserted that the bales were already inside the cabin when he arrived at the boat dock and that he noticed nothing unusual about them. Rivas also claimed that he did not hear the word "marijuana" until it was uttered by one of the Coast Guard officers.

At the close of all the evidence, the district court denied the defendants' motions

---

4. At trial, the government introduced a certification from the United States Secretary of State and his designee to prove the Honduran govern-

ment's confirmation of registry and authorization to enforce U.S. law.

for acquittal. Subsequently, the jury found each defendant guilty, under 46 U.S.C. app. § 1903(a), of aiding and abetting each other in the possession—with intent to distribute—of marijuana on board a vessel. On appeal, Pilco contends that the involuntariness of his statements to the Coast Guard rendered the statements inadmissible against him at trial. All defendants argue that a certification from the Secretary of State was inadmissible to prove the United States' jurisdiction over the vessel. With the exception of Pilco, the defendants also claim that the government failed to prove their knowing participation in the drug trafficking offense. Ospina, Rivas, and Hernandez claim error in the court's jury instructions, and Hernandez further argues that the Coast Guard's eventual destruction of the vessel violated his due process rights. Last, Rivas and Ospina challenge the court's sentencing determinations.

## II.

### Admission of Pilco's Statements at Trial

■ Pilco contends that he did not voluntarily make the incriminatory statements to the Coast Guard after they boarded the BLACK CAT and that the use of those alleged statements at trial violated his right to due process. Specifically, Pilco relies on the following facts. The cutter was over 370–feet long and heavily armed while the BLACK CAT was only 40–feet long and unarmed. At one point, a member of the Coast Guard boarding team pointed an M16 rifle at the BLACK CAT crew. Finally, upon boarding, the boarding team had the crew lie down on top of the boat because of the dangerous seas.

Following a voluntariness hearing pursuant to 18 U.S.C. § 3501(a),[5] during which Ensign Sundland testified, the district court found that Pilco voluntarily consented to both the boarding and the subsequent cabin inspection. The court ruled that the boarding,

coupled with Ensign Sundland's nonthreatening inquiries, amounted neither to custody nor coercion. The court further observed that, at the time of the statement, Pilco could have requested the boarding team to leave, and the team would have complied. Thus, the court concluded, the statement was voluntary within the meaning of § 3501.[6]

■ The ultimate voluntariness determination involves a question of law subject to plenary review. *United States* v. *Cleveland,* 106 F.3d 1056, 1064 (1st Cir.1997). We "scrutinize[ ] a district court's factual findings, including its credibility determinations, for traces of clear error." *United States v. Valle,* 72 F.3d 210, 213–14 (1st Cir.1995).

Upon careful examination of the evidence introduced at the § 3501 hearing, we find no clear error in the court's subsidiary factual findings regarding the voluntariness of Pilco's statement. Ensign Sundland's testimony, the credibility of which was a matter for the court, *see Valle,* 72 F.3d at 214, plausibly established that the boarding team members had no weapons drawn at the time of the boarding request, that Pilco freely consented to the boarding and search, and that his demeanor was "very calm" when he granted Ensign Sundland permission to inspect the cabin and to open a bale. Examining the totality of the circumstances, we cannot say that Pilco's will was "overborne so that the statement was not his free and voluntary act." *United States v. Jackson,* 918 F.2d 236, 241 (1st Cir.1990) (internal quotation marks and citation omitted). *See Schneckloth v. Bustamonte,* 412 U.S. 218, 225–27, 93 S.Ct. 2041, 2046–48, 36 L.Ed.2d 854 (1973) (discussing totality-of-circumstances approach when determining voluntariness of a confession); *see also United States v. Kimball,* 25 F.3d 1, 8 (1st Cir.1994) (finding consent voluntary where defendant expressly agreed to accompany police to station, never indicated an unwillingness to do so, and po-

---

5. 18 U.S.C. § 3501 requires a trial judge to conduct a hearing out of the jury's presence to determine the voluntariness and admissibility of a confession or self-incriminating statement made during detention or arrest.

6. We note that Pilco only challenges the voluntariness of his statements under 18 U.S.C. § 3501. His argument does not touch upon the absence of *Miranda* warnings or the manner in which any potential *Miranda* issue affects his § 3501 claim.

lice did not coerce or intimidate defendant into going with them).

Therefore, we agree with the district court that Pilco's statement was voluntary, and thus, admissible at trial.[7]

### III.

### Sufficiency of the Evidence

■ The government charged the defendants with aiding and abetting each other in the violation of 46 U.S.C. app. § 1903(a). To prove the defendants' violation of § 1903(a), the government needed to prove, beyond a reasonable doubt, that: (1) the BLACK CAT was "subject to the jurisdiction of the United States"; (2) the material found on the vessel was a controlled substance; and (3) the defendants knowingly or intentionally possessed the controlled substance with the intent to distribute it. 46 U.S.C. app. § 1903(a). *See United States v. Piedrahita–Santiago*, 931 F.2d 127, 130 (1st Cir.1991).

The defendants moved for judgment of acquittal, pursuant to Fed.R.Crim.P. 29, after the conclusion of the government's case in chief and again after the close of all the evidence. The district court denied both motions. While the defendants do not dispute the evidentiary sufficiency of the government's proof of the second element, they raise challenges regarding the first and third elements.

### A.  Standard of Review

■ We review the Rule 29 determination *de novo*, resolving any evidentiary conflicts or credibility issues in the government's favor. *See United States v. Ruiz*, 105 F.3d 1492, 1495 (1st Cir.1997). If the evidence, viewed under this lens, "permits a rational jury to find each essential element of the crime charged beyond a reasonable doubt, then the evidence is legally sufficient." *United States v. Olbres*, 61 F.3d 967, 970 (1st Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 522, 133 L.Ed.2d 430 (1995). In this analysis, "[w]e defer, within reason, to inferences formulated by the jury in the light of its collective understanding of human behavior in the circumstances revealed by the evidence." *United States v. Passos–Paternina*, 918 F.2d 979, 985 (1st Cir.1990).

■ Because Pilco and Rivas presented a defense (by way of their own testimony), they have waived review of their initial Rule 29 motions, made after the government's case in chief. *See Ruiz*, 105 F.3d at 1495 n. 1. For that reason, in reviewing their Rule 29 appeal, "we consider, in the light most favorable to the verdict, the evidence presented in the defense case." *Id.* (citing 2 Charles A. Wright, *Federal Practice and Procedure* § 463, at 643–45 (1982)).[8]

### B.  United States Jurisdiction Over the Vessel

■ The first element of a § 1903 offense requires the government to prove that the BLACK CAT was "a vessel subject to the jurisdiction of the United States." *See Passos–Paternina*, 918 F.2d at 981; *Piedrahita–Santiago*, 931 F.2d at 129 (stating that the jury determines the jurisdictional question under § 1903). Vessels subject to United States jurisdiction include "a vessel registered in a foreign nation where the flag

---

**7.**  18 U.S.C. § 3501 does not require the suppression of involuntary statements unless the person was "under arrest or other detention" at the time he made the statement. 18 U.S.C. § 3501(d). Because we find that Pilco voluntarily made the incriminating statement, we need not address the question whether he was in custody within the meaning of § 3501(d). We note, however, that the consensual nature of the boarding renders the existence of this threshold requirement highly unlikely. *Cf. United States v. Elkins*, 774 F.2d 530, 535 n. 3 (1st Cir.1985) (defendants not "in custody" during routine boarding and inspection of American flagship even though crew was "confined to one section of the boat during the lengthy Coast Guard inspection"); *United States*

*v. Lopez*, 709 F.2d 742, 745 n. 3 (1st Cir.1983) (suggesting similar conclusion).

**8.**  It is unclear whether or not the non-testifying defendants, Guerrero, Ospina, and Hernandez, intended Pilco's and Rivas' testimony to constitute defense-evidence as to them. While the non-testifying defendants' attorneys did not participate in the examination of Pilco and Rivas (except for a couple of objections), they also did not expressly rest their case until after Pilco's and Rivas' testimony. Because the evidence the government presented in its case in chief is sufficient to convict the non-testifying defendants, we need not resolve the issue.

nation has consented or waived objection to the enforcement of United States law by the United States." § 1903(c)(1)(C). Section 1903 specifically provides that the foreign nation's consent "may be obtained by radio, telephone, or similar oral or electronic means, and may be proved by certification of the Secretary of State or the Secretary's designee." § 1903(c)(1).[9]

To prove that the government of Honduras authorized the enforcement of United States law against the BLACK CAT and her crew, the government introduced various Department of State documents in which Joseph A. Conroy, Jr., the Secretary of State's designee for § 1903 certifications, certified to the events leading to the Honduran government's waiver of objection. In pertinent part, Conroy certified that Captain B.J. Niesen, Coast Guard Liaison Officer to the State Department's Bureau of International Narcotics and Law Enforcement, contacted Major John C. Sumner of the U.S. Embassy in Honduras to request the Embassy to inform the Honduran government of the contraband on board the BLACK CAT, to receive confirmation of the claim of Honduran registry, and to seek authorization for the enforcement of United States law. Conroy certified that Major Sumner subsequently contacted Captain Niesen and reported the following: (1) Lt. Claudia Castilla, Assistant Director of the Honduran Maritime Directorate, had— "on behalf of the Government of Honduras"—authorized the boarding and searching of the vessel; (2) Javier Ponce of the Honduran Merchant Marine confirmed the BLACK CAT's Honduran registry; and (3) Ivan Flores, Head of the Honduran Maritime Security, had—"on behalf of the Government of Honduras"—authorized the United States government to enforce United States law against the vessel, crew and contraband.

At trial, the defendants argued against the admissibility of these documents on hearsay grounds and complained that the government failed to produce a document from the Honduran government confirming that nation's consent. The district court disagreed with the defendants' position and admitted the documents as sufficient proof of the jurisdictional element. On appeal, Guerrero, Rivas, Hernandez and Ospina perfunctorily challenge circuit precedent dispensing with the hearsay argument. Additionally, Pilco raises a new argument, viz, that the government failed to establish that Lt. Claudia Castilla, Javier Ponce, and Ivan Flores had the authority of the Honduran government to confirm registry and consent to law enforcement action.

We have previously found the hearsay argument unavailing both because § 1903's language reveals Congress' explicit contemplation of the use of "what might normally be considered 'hearsay'" to prove jurisdiction, United States v. Romero, 32 F.3d 641, 649 (1st Cir.1994), and because "[t]he State Department Certification falls squarely within Fed.R.Evid. 803(8)(A)," id. at 650. See Fed. R.Evid. 803(8)(A) (excepting from the hearsay rule public agency statements "in any form" setting forth "the activities of the office or agency"); see also United States v. Mena, 863 F.2d 1522, 1531 (11th Cir.1989) (explaining that foreign government's expression of consent "is not hearsay at all but rather a verbal act, similar to the utterances involved in making a contract, to which the law attaches independent significance"). We see no reason to alter Romero's reasoning in this respect.

We also find unavailing the defendants' trial contention that the government was required to procure and introduce a written statement of no objection from the Honduran government. While the government may prove a foreign government's consent through a number of alternative means, see Mena, 863 F.2d at 1531, section 1903 plainly indicates the sufficiency of the Secretary of State's certification to prove that fact. See

---

9. We analyze this case under the pre–1996 version of 46 U.S.C. app. § 1903, pursuant to which the defendants were tried and convicted. We acknowledge that the 1996 amendments to § 1903 provide that the Secretary of State's certification "conclusively" proves a foreign nation's consent, and that United States jurisdiction over vessels is no longer an element of an offense, but rather, a preliminary question of law for the trial judge. See 46 U.S.C. app. §§ 1903(c) & (f) (Supp.1997). We express no opinion as to the scope, validity or interpretation of these amendments.

46 U.S.C. app. § 1903(c)(1) (stating that the foreign nation's consent "may be proved by certification of the Secretary of State or the Secretary's designee"); *Romero,* 32 F.3d at 649 (explaining that § 1903 "was designed to ease evidentiary requirements for the government by avoiding the time-consuming and burdensome task of obtaining official documentation from the claimed country of registry").

We are equally unpersuaded by Pilco's attempt to transform his trial argument into his present contention: that the certification was inadmissible because the government did not show the authoritative status of the persons in Honduras who authorized United States' law-enforcement action. Because Pilco failed to raise this argument below, we review for "plain error" and reverse only if an "obvious" or "clear" error exists that affects "substantial rights." *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993). *See* Fed. R.Crim.P. 52(b).

In *Romero,* the Colombian government refuted a claim of Colombian registry, thus rendering the vessel "stateless" and therefore subject to United States jurisdiction under 46 U.S.C. app. § 1903(c)(1)(A). *See* 32 F.3d at 647–48. The government proved the jurisdictional element through a State Department certification, much like the one at issue here, explaining the events leading up to Colombia's refutation of registry. *See id.* at 648. We reasoned that the statutory scheme of permitting proof of certain jurisdictional facts through certification meant that "the government need not prove that the vessel is in fact without registry in another country, nor must it prove that the foreign nations' denial or refutation of registry is valid, legitimate, or otherwise properly made." *Id.* at 649. We declined to decide whether a defendant's endeavor to prove actual registry facts would be irrelevant under the statutory scheme, and expressly reserved the questions whether and when a defendant may challenge "the actions of foreign nations in situations that might warrant determination, probably by the court, as to whether a proper certification was being offered." *Id.* at 649 n. 3.

In this case, Pilco seeks to question the validity of the Honduran government's consent by requiring clarification of the source's authority. His challenge touches upon the preserved issue in *Romero,* i.e., whether and to what extent a defendant may look behind the State Department's certification to challenge its representations and factual underpinnings. We have not yet had occasion to resolve the issue, and the "plain error" standard of review does not call upon us to correct unobvious errors. *See Johnson v. United States,* ——. U.S. ——, —— — ——, 117 S.Ct. 1544, 1549–50, 137 L.Ed.2d 718 (1997) (indicating that, to be "plain," the error must be clear at least at the time of appellate review ). Moreover, Pilco does not raise a colorable claim that the certification was prepared fraudulently or in bad faith. *See Romero,* 32 F.3d at 649 n. 3. Thus, we decline to decide whether a defendant may contest the authority of the source of the consent or whether Congress intended to leave that matter to the State Department's expertise.

In the absence of error, plain or otherwise, in the district court's admission of the Secretary of State's certification, we find the evidence sufficient to prove the first element of 18 U.S.C. § 1903(a).

### C. *Knowing Participation*

■ Rivas, Guerrero, Ospina, and Hernandez claim that the government failed to prove the third element of a § 1903(a) offense, their knowing possession of a controlled substance with the intent to distribute it. While they do not dispute the fact that they were hired as crew members to assist in the BLACK CAT's shipping of cargo, they assert that the evidence was insufficient to establish that they knew the bales contained contraband. Absent that knowledge, they argue, their "mere presence" aboard the BLACK CAT could not rise to the level of aiding and abetting the drug-trafficking offense.

■ To prove aiding and abetting liability under 18 U.S.C. § 2, the government needed to establish that the defendants " 'participated in the venture and sought by their actions to make it succeed.' " *United*

*States v. Steuben,* 850 F.2d 859, 864 (1st Cir.1988) (quoting *United States v. Quejada–Zurique,* 708 F.2d 857, 859 (1st Cir.1983)). " 'Mere presence at the scene or even knowledge that the crime is being committed is generally insufficient to establish aiding and abetting.' " *Steuben,* 850 F.2d at 864 (quoting *Quejada–Zurique,* 708 F.2d at 859).

The question whether the evidence sufficiently establishes a defendants' knowledge of the presence of a controlled substance is distinct from, although related to, the issue of a defendant's level of participation in a drug-trafficking venture. Thus, for example, even when the government proves that a defendant knew that her residence was used by a co-occupant to sell drugs, the government must additionally prove that she participated criminally in the venture. *See United States v. Ocampo,* 964 F.2d 80, 82 (1st Cir.1992) (involving conspiracy charge); *United States v. Hyson,* 721 F.2d 856, 862–63 (1st Cir.1983) (same). In such cases, proof of sufficient participation in the crime, as well as knowledge of it, is required to convict; the defendant's "mere presence" at the scene of criminal activity is not enough. By like token, where, as here, a defendant actively participates in a venture, but denies any knowledge of the venture's illegal nature, the government must adequately prove knowledge, more so than participation.

With the exception of its case against Pilco, the government largely relied upon circumstantial evidence to prove the defendants' knowing participation in the transportation a controlled substance. In circumstantial cases such as this one, the evidence is sufficient to convict if it adequately supports "the requisite 'two-step inference' ": (1) that the vessel was engaged in obviously illegal activity and (2) that each defendant was ready to assist in the criminal enterprise. *United States v. Jimenez–Perez,* 869 F.2d 9, 11 (1st Cir.1989) (quoting *Steuben,* 850 F.2d at 867). We refrain from second-guessing the jury's inferences and ensuing conclusions drawn from circumstantial evidence where "the inferences derive support from a plausible rendition of the record" and where "the conclusions flow rationally from those inferences." *United States v. Spinney,* 65 F.3d 231, 234 (1st Cir.1995).

### 1. Knowledge of Controlled Substance

The defendants place great weight on the absence of evidence that the bales emitted any odor of marijuana. They reason that without this evidence, a jury could not rationally infer their knowledge of the bales' contents. We have eschewed, however, a myopic inquiry into whether "one particular indication of knowledge (such as a smell) did, or did not, exist." *United States v. Robinson,* 843 F.2d 1, 8 (1st Cir.1988). Instead, we must "look[ ] at the evidence as a whole in the light most favorable to the government, and leav[e] to the jury the power to make any reasonable set of common sense assumptions about the working of human nature." *Id.* (internal quotation marks and citations omitted). *See. United States v. Molinares Charris,* 822 F.2d 1213, 1220 (1st Cir.1987) (finding circumstantial evidence of defendant's active participation in illegal cargo transport sufficient to prove knowing participation even assuming marijuana "was hidden in scent as well as in sight").

Thus, in the absence of evidence of marijuana odor, we turn to other factors to determine whether or not the government sufficiently established the crew's knowledge of the presence of a controlled substance. We have previously looked to factors such as the closeness of the crew's relationship, the length of the voyage, the size and condition of the vessel, the quantity of marijuana, and the absence of a legitimate purpose for the voyage. *See Robinson,* 843 F.2d at 8–9; *see also Molinares Charris,* 822 F.2d at 1219–20; *United States v. Lopez,* 709 F.2d 742, 747 (1st Cir.1983). These factors, while not exhaustive, indicate that where the circumstantial evidence permits a jury to conclude that activities aboard a vessel concern the obvious presence of contraband, the jury reasonably may infer the crew's knowing participation in the venture. *See Molinares Charris,* 822 F.2d at 1218; *Quejada–Zurique,* 708 F.2d at 859–860.

In this case, although the bales of marijuana had been packaged carefully and emitted no odor, the surrounding facts permit a jury

finding that the BLACK CAT was conspicuously involved in the illegal transport of a controlled substance. According to the trial evidence, the vessel's low-profile construction signalled its plain purpose to avoid detection. *See United States v. Romero*, 32 F.3d 641, 644 (1st Cir.1994) (involving similarly constructed vessel). The vessel had been equipped with expensive and sophisticated radio and navigational gear that, the testimony suggested, was generally intended to assist in long-distance voyages and unusual for this small recreational vessel. *See id.; Passos–Paternina*, 918 F.2d at 985. The disproportionately large fuel tanks awkwardly placed on the aft deck and the plentiful, undepleted food supply indicated that the BLACK CAT had recently embarked on what was expected to be a long journey.[10] The use of a recreational craft to carry the large shipment, without commercial documentation, beyond the normal area of operation for such a vessel further evinced the voyage's illegitimate purpose. *Cf. Robinson*, 843 F.2d at 9 (involving a " 'mudboat,' a vessel that normally supplies oil rigs in the Gulf of Mexico," found near Bermuda).

Perhaps most telling for the purposes of this case were the numerous unlabeled bales, wrapped in a fashion typical for controlled-substances likely to be off-loaded at sea. The bales were so ubiquitous that they left no room to stand or sit in the cramped cabin. *Compare Piedrahita–Santiago*, 931 F.2d at 131 ("[A] relatively small vessel carrying a large quantity of drugs is indicative of knowl-

edge and involvement on the part of the crew."); *with Steuben*, 850 F.2d at 868–69 (reversing conviction where, *inter alia*, the government failed to produce evidence that defendant knew the illegal nature of cargo concealed in barge towed behind tug). The rough seas and the limited space to stand on deck permitted the inference that the crew spent its time together below, among the bales.[11] Finally, the crew's emergence from the cabin area with their belongings in hand upon the Coast Guard's approach permits the inference that they knew they had been caught in an illegal venture, and would eventually be arrested.

Although these facts, in isolation, do not necessarily lead to the conclusion that the crew members knew the bales contained a controlled substance, in combination, they constitute more than enough evidence to support a finding of positive knowledge, or at least deliberate ignorance,[12] of that fact. *See Robinson*, 843 F.2d at 9; *see also United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir. 1992) (explaining that "juries are not required to examine the evidence in isolation, for 'individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.' ") (quoting *Bourjaily v. United States*, 483 U.S. 171, 179–80, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987)). The government's proof need not have "exclude[d] every reasonable hypothesis of innocence," *Robinson–Munoz*, 961 F.2d at 305,

10. The government introduced evidence that it would have taken only twenty hours to travel from the point of interception to Aruba, the purported destination. This evidence suggested that the plentiful food and fuel supply would have been unnecessary for the claimed voyage. The evidence also established that had the vessel departed from Panama as originally claimed, the voyage would have taken two to three days and at least one-half of the fuel would have been used to reach the point of interception, some 400 miles away from the nearest Panamanian port.

11. The proximity of the crew on board the BLACK CAT is also indicative of the closeness of their relationship. *See Robinson*, 843 F.2d at 8 (noting evidence that crew member had spent time on captain's deck as probative of close relationship). The evidence further suggested that the crew may have been larger than neces-

sary to operate the small vessel during its stated journey. *See Piedrahita–Santiago*, 931 F.2d at 130 (involving seven crew members on forty-foot vessel that "would ordinarily require a crew of only three or four" and explaining that "[a] larger crew than ordinarily needed for navigation purposes suggests that the crew was hired for the purpose of loading and unloading cargo rather than merely steering the vessel").

12. Where " 'the facts suggest a conscious course of deliberate ignorance,' " a jury is warranted in finding the defendants' deliberate ignorance of criminal events, which is tantamount to knowledge. *United States v. Cassiere*, 4 F.3d at 1006, 1023–24 (1st Cir.1993) (quoting *United States v. Littlefield*, 840 F.2d 143, 148 n. 3 (1st Cir.1988)). The district court instructed the jury on the deliberate ignorance, or willful blindness, theory of knowledge. *See infra* Part IV.

and the evidence permitted a reasonable inference that unwitting bystanders would not have been hired to participate in the BLACK CAT's obvious illegal transport of millions of dollars' worth of contraband. *See United States v. Cuevas–Esquivel,* 905 F.2d 510, 515 (1st Cir.1990); *United States v. Luciano Pacheco,* 794 F.2d 7, 11 (1st Cir.1986); *United States v. Guerrero–Guerrero,* 776 F.2d 1071, 1076 (1st Cir.1985). While the jury could have found that the crew sincerely believed that the bales contained legitimate cargo, the evidence certainly did not compel that conclusion.

### 2. Participation

We now turn to the defendants' contention that their "mere presence" aboard the BLACK CAT did not rise to the level of aiding and abetting. For the most part, the evidence establishing their knowledge of the illegal nature of the cargo disposes of this issue. Additionally, the evidence permitted the reasonable conclusion that the purpose of each defendant's presence aboard the vessel was to assist in the transport and handling of the illegal cargo. For example, the large quantity of cargo made travel aboard the vessel uncomfortable, thus belying any lawful purpose such as pleasure-cruising, educational experience, or adventure.[13] Because the crew's presence on board the BLACK CAT evinced more than a coincidental association with the criminal venture, a jury could rationally infer that the circumstances "fairly imply participatory involvement." *United States v. Echeverri,* 982 F.2d 675, 678 (1st Cir.1993) (also explaining that the "mere presence" argument holds no water "where the 'mere' is lacking").

We find, therefore, that the evidence supported the requisite two-step inference: (1) the BLACK CAT was engaged in the obvious transportation of a controlled substance and (2) each defendant was ready to participate in the venture. *See Jimenez–Perez,* 869 F.2d at 11. The defendants do not dispute that the large quantity of marijuana on board the

vessel permitted the inference of an intent to distribute the controlled substance. *See Echeverri,* 982 F.2d at 678. Thus, we conclude that the evidence was sufficient to prove that the defendants, aiding and abetting each other, knowingly possessed a controlled substance, marijuana, with the intent to distribute it.

In light of the above, we find no error in the district court's denial of defendants' motions for acquittal.

## IV.

### Jury Instructions

Ospina, Hernandez, and Rivas argue that the district court committed reversible error in instructing the jury on reasonable doubt, deliberate ignorance, and mere presence. Although the defendants raised their concerns both during a formal charge conference and in writing, they did not renew their objection after the court charged the jury. This procedural default triggers only "plain error" review. *See United States v. Mendoza–Acevedo,* 950 F.2d 1, 4 (1st Cir.1991).

Citing *United States v. Andujar,* 49 F.3d 16, 23 (1st Cir.1995), the defendants requested the district court to include the following jury instruction when discussing "reasonable doubt": "If you jurors, view the evidence in the case as reasonably permitting either of two conclusions—one of innocence, the other of guilt—the jury should of course adopt the conclusion of innocence." The court rejected the proposed instruction.

■■■ In *Andujar,* we explained that an appellate court must reverse a conviction on the grounds of evidentiary insufficiency "where an equal or nearly equal theory of guilty and a theory of innocence is supported by the evidence viewed in the light most favorable to the verdict." 49 F.3d at 20 (internal quotation marks and citations omitted). In such cases, "a reasonable jury must necessarily entertain a reasonable doubt." *Id.* Our explanation of the scope of appellate review, however, does not necessarily trans-

---

**13.** *Cf. United States v. Mehtala,* 578 F.2d 6, 10 (1st Cir.1978) (finding no criminal participation given the small packages of easily concealable contraband and the absence of evidence indicating that defendant "embarked on the voyage for any purpose other than a pleasure cruise");

*United States v. Francomano,* 554 F.2d 483, 486 (1st Cir.1977) (reversing convictions of crew members on same voyage involved in *Mehtala* and noting that crew consisted of "young men, short of funds, seeking travel for educational experience and adventure").

late into a proper jury instruction. The defendants' proposed instruction comes close to making a comparison between "guilt or innocence," which, if suggested as equal alternatives, " 'risks undercutting the government's burden by suggesting that they should find the defendant guilty if they think he is not innocent—regardless of how convincing the government's proof has been.' " *Id.* at 24 (quoting *Mendoza–Acevedo,* 950 F.2d at 4). Given our repeated admonition against overdefining "reasonable doubt," *see id.* at 23 (noting that attempts to clarify the concept may, serve to obfuscate it), we find no plain error in the court's refusal to adopt the proposed instruction.[14]

■ Hernandez further complains that the district court's instruction on "deliberate ignorance," followed immediately by its charge concerning "mere presence," confused the jury regarding the requirements of aiding and abetting liability. We disagree. The court instructed the jury that a defendant's knowledge of a particular fact may be inferred from proof that he deliberately closed his eyes to the obvious. The court then stated, "[y]ou have heard the word[s] 'mere presence' in this case," and explained that mere presence at the scene of a crime, or mere association between the principal and those accused of aiding and abetting, is insufficient to establish guilt. In our view, the court's instructions adequately distinguished between the deliberate-ignorance theory, which relates to the defendants' knowledge of a fact, and the mere-presence theory, which concerns the level of defendants' participation in the crime. *See United States v. Cassiere,* 4 F.3d at 1006, 1023 (1st Cir.1993). Under plain error review, we find no clear risk of confusion.

## V.

### Destruction of Vessel

The Coast Guard's act of sinking the vessel by machine gun fire because of its concern

for navigational safety is not unprecedented. *See, e.g., United States v. Doe,* 860 F.2d 488, 490 (1st Cir.1988). Nevertheless, Hernandez asserts that the destruction was unnecessary and suggests that this act amounted to a deprivation of due process under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), and *Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). Hernandez' failure to explain the potential materiality or usefulness of the vessel to his defense, and his concession that no evidence demonstrates bad faith in connection with the vessel's destruction, render his argument specious. *See Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337–38; *United States v. Gallant,* 25 F.3d 36, 39 (1st Cir.1994); *cf. United States v. Alston,* 112 F.3d 32, 35 (1st Cir.1997) (finding no due process violation where government "deliberately alter[ed] evidence that, in its original form, might have helped to exculpate [defendant]," but where defendant did not demonstrate that such action significantly impaired his defense).

## VI.

### Sentencing Issues

Rivas and Ospina contend that the district court erred in calculating their sentences. Because they failed to raise their arguments below, we review for "plain error." *See United States v. Peppe,* 80 F.3d 19, 22 (1st Cir.1996). We discuss each defendant in turn.

### A. Rivas

■ At sentencing, the district court increased Rivas' base offense level upon finding that he acted as "pilot" aboard the BLACK CAT. *See* U.S. Sentencing Guidelines Manual § 2D1.1(b)(2)(B) (requiring a two-level increase if "the defendant acted as

**14.** At oral argument before us, Hernandez suggested for the first time that the court erred in using the phrase "hesitate to act" when discussing reasonable doubt. Despite the fact that new issues raised at oral argument are normally deemed waived, *see United States v. De Leon Ruiz,* 47 F.3d 452, 455 n. 1 (1st Cir.1995), out of an abundance of caution we have carefully reviewed the court's charge. Although the "hesitate to act" language is "arguably unhelpful," *Gilday v. Callahan,* 59 F.3d 257, 264 (1st Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1269, 134 L.Ed.2d 216 (1996), under our reasoning set forth in *Andujar,* 49 F.3d at 23–24, we find no error.

**346**

a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel carrying a controlled substance"). Rivas asserts that the guideline only applies to offense participants in a position of authority or command. He reasons that the guideline should not apply to him because he did not possess special navigational rank or skills and merely steered the vessel upon the master's instruction.[15]

The sentencing guideline does not define the word "pilot," and our research has not revealed any caselaw to inform our inquiry. Nevertheless, the common dictionary definition of "pilot" includes a person hired to steer a vessel. *See, e.g.,* Webster's Third New International Dictionary of the English Language 1716 (1986) (defining "pilot," *inter alia,* as "one employed to steer a ship: helmsman"). While the act of steering a forty-foot vessel on the high seas may or may not involve a skill obtained through extensive maritime training, we cannot say that the district court committed plain error in finding that Rivas "acted as a pilot" aboard the boat within the meaning of U.S.S.G. § 2D1.1(b)(2)(B). Furthermore, we disagree with Rivas' contention that the guideline applies only to those with special command in a criminal enterprise. While the guideline may speak to a defendant's control over some mechanical aspect of a vessel's operation, it does not address the defendant's authority over other individuals involved in a criminal venture. *Cf.* U.S.S.G. § 3B1.1 (providing enhancements for a defendant's role as "organizer, manager, or supervisor").[16]

**B.  *Ospina***

Ospina belatedly argues that the district court incorrectly calculated his incarcerative

sentence based on an enhanced statutory maximum of thirty years, rather than twenty years, under the Career Offender Guideline. *See* U.S.S.G. § 4B1.1. Ospina's argument fails both because the statutory maximum term for his offense remained fixed at life imprisonment without any enhancement, *see* 21 U.S.C. § 960(b)(1)(G), and because, in any event, the Supreme Court has reversed his cited authority, *see United States v. LaBonte,* — U.S. —, —, 117 S.Ct. 1673, 1675–76, 137 L.Ed.2d 1001 (1997) (reversing *United States v. LaBonte,* 70 F.3d 1396 (1st Cir. 1995)).

## VII.

### Conclusion

For the foregoing reasons, the judgment of the district court is ***affirmed.***

---

**15.** The district court adopted the factual findings set forth in Rivas' Presentence Investigation Report, which, though not made a part of the appellate record, presumably sets forth the facts leading to the "pilot" finding. Rivas did not object to any portion of the report during his sentencing hearing and does not dispute that he steered the vessel.

We further note that at trial, over which the sentencing judge presided, Rivas testified that he had been hired by a man looking for "any seaman who was available to navigate." When the ship set sail, he complied with Pilco's instruction to "take care of the helm," which Rivas manned

for a four hour shift. Furthermore, when asked whether commercial cargo is usually labeled so that those handling the cargo are aware if its contents, Rivas replied, "No, because that was not my job.... *I was told I was in charge of the helm, which was my profession.*" (emphasis added).

**16.** We note that the government chose not to seek an offense-level increase on the alternative basis of "use of special skill." U.S.S.G. § 3B1.3. The commentary to § 2D1.1 specifies that § 3B1.3 is inapplicable if the sentencing court, as here, assesses an enhancement under § 2D1.1(b)(2)(B).